## MUTUAL BENEFIT HEALTH & ACCIDENT ASSOCIATION v. ARRINGTON.

4-5971 140 S. W. 2d 427

Opinion delivered May 20, 1940.

*Smith & Judkins,* for appellant.

*Ivie C. Spencer,* for appellee.

HOLT, J. Appellee, Mrs. Mae Arrington, as beneficiary under an insurance policy issued to her husband by appellant, sued to recover an alleged balance due under the policy. The insurance was for the amount of $3,000. It is undisputed here that the insured, appellee's husband, while engaged as a "gravel checker" was run over and killed instantly by a truck. At the time of his death the policy which covered accidental death, was in full force and effect, and all premiums had been paid. Due proof of death was furnished appellant.

Appellant, through its agents, paid appellee $1,250 and took a release from her which they contend is a full settlement of her rights under the policy.

Appellee, on the other hand, insists that she was induced by fraud and deception to enter into a release and to accept $1,250 in settlement of the claim, that she is not bound by said release and settlement, and brought suit to recover $1,750, balance alleged to be due her under the insurance contract, and for penalty and attorney's fee.

Appellant defended on the ground that appellee had executed a valid release for a consideration of $1,250.

Upon a trial to a jury, the case was submitted upon instructions not abstracted and not complained of here, and a verdict was returned in favor of appellee for $1,750, whereupon a judgment was entered for this amount and as part of the costs a 12 per cent. penalty

and attorney's fee of $350 were assessed. This appeal followed.

The sole question presented for review is: Was the release executed by appellee a full and complete settlement of her rights under the insurance policy in question? Appellant contends that the release was entered into in good faith and is binding on appellee. Appellee, on the other hand, contends that she was induced to sign the release through fraud and deception and, therefore, it is not binding on her.

There are but two provisions in the insurance contract abstracted and relied upon by appellant as material here. They are: "1. . . . No reduction shall be made in any indemnity herein provided by reason of change in the occupation of the insured or by reason of his doing any act or thing pertaining to any other occupation. . . . 12. If the insured shall at any time change his occupation to one classified by the Association as less hazardous than that stated in the policy, the Association, upon written request of the insured, and surrender of the policy, will cancel the same and will return to the insured the unearned premium."

Five weeks after the death of the insured (appellee's husband), Mr. Crum, agent, and Mr. Laser, adjuster for appellant, contacted appellee at the farm home of her stepson, Gerald Arrington. There were present at this meeting Gerald, his wife, Mr. Crum, Mr. Laser and appellee.

Appellee, whose testimony was fully corroborated by Gerald Arrington and his wife, Mrs. Gerald Mayfair Arrington, testified that she was not expecting appellant's representatives to call at that time, that she was ill, highly nervous, had been an invalid for about 12 years, had had many operations, and was in no condition to transact business. Mr. Crum began the negotiations and "began telling the different things, the reason why she wasn't going to get the full three thousand dollars and began to explain things to me and the way he was approaching me he made it appear I wasn't going to get anything. I said, 'Mr. Crum, do you mean to tell me

this insurance is no good.' He said, 'No, m'am, I don't mean that, but I mean you are not going to get it all.' . . . Mr. Laser then took up the conversation and went ahead and he, of course, told about the same Mr. Crum was telling on account of him changing occupations and all the policy was not going to be full faced value, and I, of course, tried to argue with them that he had not changed his occupation and had no thought of changing it, he was merely filling in the time because he had a chance of getting extra work.'' Mr. Laser told her that there was provision in the policy that if insured had changed occupations, she couldn't get anything under it, and further that she might get a lawyer ''and sue for the full face value of this three thousand dollars, but you would have to give your lawyer half of it and you would only have fifteen hundred dollars left anyway, and you don't know when you would get it.'' ·

''Well, as I went ahead to say, I told him, I said, 'I hope you don't aim to force me into a law suit into court to collect this insurance when I thought it was absolutely in good standing in every way, I furnished proof it was an accident and death. . . . You know I had never had any experience like this and I dreaded it and they went ahead to say that they didn't have to pay anything, they were merely giving me that so I thought well if that is the way it was I had ought to take that. I didn't know how my health was going to be and I knew I was going to have to have money to go ahead and live and if this is the way it stands I had better take what I can get.''

She further testified that they had with them the voucher and release already prepared and that she signed the release and accepted the $1,250 payment.

Appellant's agents did not deny telling appellee that the most she could recover under the insurance policy was $1,250 for the reason that her husband, the insured, had given his occupation as ''teacher and insurance man'' and had later temporarily changed to that of a ''gravel checker'' without notifying the company.

Appellant does not abstract the instructions and we, therefore, assume that the question whether the

release in question was obtained through misrepresentation or fraud was submitted to the jury under proper instructions.

After a careful review of this record, we are clearly of the view that there is substantial testimony to support the jury's verdict and, therefore, we do not disturb it here.

Under the plain and unambiguous terms of the insurance policy in question, no reduction can be made in any indemnity by reason of any change in the occupation of the insured, or by reason of his doing any act or thing pertaining to any other occupation.

Appellant cites us to no provision in the policy that would relieve it of liability, or entitle it to a reduction of the total amount of the policy, should the insured engage in a more hazardous occupation without notifying it, even if we were to assume that the occupation of "gravel checker" to be more hazardous than that of "teacher and insurance man."

There is a provision however, in the policy set out above which provides that "If the insured shall at any time change his occupation to one classified by the Association as less hazardous than that stated in the policy, the Association, upon written request of the insured, and surrender of the policy, will cancel the same and will return to the insured the unearned premium."

Certainly appellant is in no position to complain if the insured failed to notify it that he was changing to a *less hazardous* occupation, for this provision "12" is for the benefit of the insured, not the insurer, and clearly no right under the policy is denied the insured, or his beneficiary (appellee), should the insured fail to avail himself of the privilege accorded under this section.

The situation presented is that appellant's representatives contacted appellee at a time when she was nervous, up-set, and in no condition to transact business. She was not expecting them and was without the advice of counsel as to her rights under the insurance policy. She was not dealing with appellant's agents at arm's length. Their representations to her as to her rights

under the policy and the effect of its provisions were incorrect, and as we have indicated, the evidence was sufficient to warrant the finding by the jury that she had been misled and the release procured by acts and representations amounting to fraud. It can make no difference whether these representations were made with the intent to deceive, or in good faith. If they did deceive appellee and induce her to execute the release, the result would be the same.

In the case of *Harper* v. *Bankers' Reserve Life Co.,* 185 Ark. 1082, 51 S. W. 2d 526, this court said: "Appellant is a woman of moderate education, not unlettered or ignorant, but inexperienced in business matters. She lived on a small farm near Palatka, Arkansas, with her husband and five small children, aged from 11 to 2, until his death. She made proof of death, but heard nothing from appellee until June 29, 1927, when its agent, Mr. Dow, and Mr. Arnold came to see her. She was not well at the time. Dow told her the company didn't intend to pay the policy, and that he had brought the premium, about $29 and would pay that back, and wanted to take up the policy. She refused to take it. She asked to be permitted to go to town to consult with a friend, but was told that if she refused to accept that, it was all she would get. He told her Mr. Harper had 'lied' in his application, and that he had cancer of the rectum at that time, and the policy was null and void. She told him if she couldn't collect the policy she would lose her home and he talked to her so that she broke down and cried; told her again that the return of the premium was all he would pay." On this state of facts the court held: "But the question here is, was the settlement conclusive of appellant's rights as a matter of law under the evidence, or was it a question for the jury? We think the question one for the jury as to whether the release was procured by fraud or coercion."

In the case of *National Life & Accident Ins. Co.* v. *Blanton,* 192 Ark. 1165, 97 S. W. 2d 77, the principle of law announced applies here, and there this court held (quoting headnote):

"Where an action on a life insurance policy was defended on the ground that, in consideration of return of premiums paid appellee had released insurer from all liability, and the testimony showed that a number of agents of insurer visited appellee, and, in their efforts to secure the release, told her that if she tried to get the insurance she would be sent to the penitentiary, and the jury accepted this testimony as true, the supreme court will also accept it as true, and hold that it established such duress as to render the contract of release unenforceable."

And in the case of *Union Compress & Warehouse Co.* v. *Shaw,* 187 Ark. 249, 59 S. W. 2d 1021, this court held, (quoting headnote): "Although an illiterate plaintiff in a personal injury case may not avoid a release executed by him on account of not having it read to him, he may avoid it if he was induced to sign the release by deception practiced by defendant's agent in procuring the release, whether such deception was intentionally fraudulent or not."

On this record we find no error and accordingly the judgment is affirmed.